710 A.2d 1 (1998)
BOROUGH OF FORT LEE, Plaintiff-Appellant,
v.
BANQUE NATIONAL DE PARIS and DBR Management, Defendants-Respondents, and
Fort Lee Headquarters Limited Partnership, and Red Rock Holdings Ltd., Defendants.
Superior Court of New Jersey, Appellate Division.
Argued November 12, 1997.
Decided April 27, 1998.
*2 Steven D. Muhlstock, Fort Lee, for plaintiff-appellant (Gittleman, Muhlstock, Chewcaskie & Kim, attorneys; Mr. Muhlstock on the brief).
Kenneth N. Laptook, Roseland, for defendants-respondents (Wolff & Samson, attorneys; Mr. Laptook and Vanessa H. Silverstein on the brief).
Before Judges DREIER, KEEFE and WECKER.
The opinion of the court was delivered by WECKER, J.A.D.
In early 1993, an underground gas leak forced the Police Department of plaintiff, Borough of Fort Lee, to relocate its entire headquarters including the municipal jail, to temporary facilities. A five-story office building in the Borough, known as 2115 Linwood Avenue, was largely vacant at the time and was the subject of a pending foreclosure action brought by defendant Banque National de Paris (the Bank). Plaintiff entered into a one year, temporary occupancy agreement with then owner, defendant Fort Lee Headquarters Limited Partnership,[1] for the department to occupy the 14,200 square foot, fifth floor of 2115 Linwood Avenue for a one-year period from February 1, 1993 through January 31, 1994. A contemplated lease agreement was never signed, but the occupancy was extended for an additional year to January 31, 1995, by agreement between the Borough and defendant DBR Management, the rent receiver for the property appointed in March 1993. Negotiations for a further extension were unsuccessful. The Bank, by this time the owner of the property, served a demand for possession effective August 1, 1995. The police department refused to vacate, and plaintiff brought this action seeking the right to remain in possession. *3 The Bank counterclaimed for possession and damages. These facts, found by the trial judge, are not disputed.
After several days of trial, the Chancery Division Judge dismissed plaintiff's claim, concluding that plaintiff had been a trespasser since August 1, 1995. That conclusion is not and cannot be disputed. The judge awarded defendant a total of $465,188 in damages through that date, consisting of (1) $65,004 as underpayment of rent for the occupied fifth floor, at fair market value, for the period August 1, 1995 through July 31, 1996; (2) $337,250 as lost rent on the theory that plaintiff's holdover prevented defendant from leasing the vacant second, third, and fourth floors;[2] and (3) $62,934 as promised but "unpaid real estate tax credits" (including prejudgment interest) attributable to the municipal occupancy. The judgment also required plaintiff to pay $74,550 in "monthly use and occupancy fees" as a condition of staying the writ of possession. Plaintiff appeals only from that portion of the judgment awarding "lost rents in excess of $65,004."
This appeal presents the following questions: (1) Was there sufficient evidence to support the court's implicit conclusion that plaintiff's trespass was the sole proximate cause of defendant's inability to lease the three vacant floors of its building, in the absence of explicit findings thereon? (2) In calculating lost profits on the vacant space, did the court take the correct factors into account and make sufficient findings to support its calculation? Our answer to both questions is "No."
The irony of the police department's trespass has not escaped us. Nevertheless, we conclude that the Chancery Judge did not sufficiently explain his implicit conclusion that plaintiff's continuing trespass on defendant's property was the sole proximate cause of defendant's inability to lease three other floors of the property, space which had been vacant for three years prior to plaintiff's initial, lawful occupancy. In addition, the judge erred in omitting, in his calculation of lost profits, some reduction to reflect the cost of those repairs required to market the space at the purported market rent. Finally, the judge did not adequately explain his calculation of the overhead expenses by which he reduced gross rent to net rent, i.e., lost profit. We therefore vacate that portion of the judgment for lost rent, $337,250, that the court awarded with respect to the vacant second, third, and fourth floors of the property, and remand the matter for a determination of comparative causation and a redetermination of lost profits.[3]
After several days of testimony in June and July 1996, the judge placed findings and decision on the record on July 25, 1996, including the following conclusions of law which are not disputed on appeal: (1) The bank did not expressly or implicitly agree to allow the police department to remain beyond February 1995. (2) The police department was a trespasser as of August 1, 1995, either because its license to use the premises under the extended occupancy agreement had expired or because a month-to-month tenancy had expired, and because the Bank served a notice to quit and demanded possession as of August 1, 1995. (3) The Bank was entitled to a writ of possession immediately at the conclusion of the trial, but public safety concerns warranted a stay of execution of the writ until March 1, 1997, on condition that plaintiff would pay market rent. (4) The Bank was entitled to $65,004, the difference between the rent plaintiff actually paid and rent calculated at a net rate of $18 per square foot for the period August 1, 1995 through July 31, 1996. (5) The Bank was entitled to the promised real estate credit, $59,248, plus pre-judgment interest of $3,686 pursuant to R. 4:42-11, totalling $62,934.
However, on appeal the Borough disputes several findings of fact and conclusions of law. The Borough contends that the court erred in implicitly finding that the police department's presence on the fifth floor of *4 the building was the sole proximate cause of the Bank's failure to lease the second, third and fourth floor space as of August 1, 1995. The Borough also contends that the court erred in finding that defendant did not fail to mitigate damages by delaying repairs necessary to attract "class B" tenants and by refusing to lease the space at a lower rent to "class C" tenants. Finally, the Borough cites error in the court's calculation of lost profits by overstating the gross market (rental) value of the space; by understating necessary overhead expenses; and by refusing to include among those expenses some factor for the cost of essential repairs. As a result, the Borough contends that the inclusion of $337,250 in the total $402,254 awarded as lost rent represents a windfall for defendant.
The applicable standard of review is limited. We will defer to the factual findings of the trial judge so long as they are supported by adequate, substantial, and credible evidence in the record. Township of West Windsor in the County of Mercer v. Nierenberg, 150 N.J. 111, 132-33, 695 A.2d 1344 (1997); Rova Farms Resort, Inc. v. Investors Ins. Co. of America, 65 N.J. 474, 484, 323 A.2d 495 (1974). Legal conclusions, however, are not entitled to the same deference; we address questions of law de novo. Manalapan Realty v. Township Comm. of Tp. of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995).
We first address the proximate cause issue. The evidence is undisputed that the second, third and fourth floors of the building were vacant during the three years prior to the police department's initial occupancy in February 1993.[4] Anne Shean, vice-president of the Bank in charge of "special assets," including foreclosed real property, testified as follows:
Q. And are you aware of whether or not there have been any tenants on the second, third, fourth floors of that building at any time during the past couple of years?
A. None since Alpha Lavelle.
THE COURT: What?
A. The Alpha Lavelle was the tenant who had owned the building and then did a sale lease-back transaction and it occupied it under a lease for a period of time.
Q. And that ended sometime in 1990?
A. Yes, I believe so.
Q. So the second, third and fourth floors have been vacant since then?
A. Correct....
The second, third and fourth floors remained vacant through the date of trial.[5]
Defendant's experts with respect to proximate cause and damages were Anne Shean and Dennis McConnell. Plaintiff's expert was Anthony Rinaldi. These witnesses essentially agreed that the age of the building prevented its valuation as a "class A" or most desirable office building and that in good structural repair and with cosmetic improvements, its location, size and facilities would make it a "class B" building, which according to Shean would attract "corporate type tenants, an accounting firm, back office operation to financial institution." There was ample testimony to support the judge's conclusion that the building, with certain repairs, could attract "class B" tenants, but they would be unwilling to occupy a building that also housed the entire Fort Lee police operation; that without sufficient repairs and with the police presence, the building could not attract sales or marketing offices whose clients would visit the building, but could only attract class C tenants, at a lower rent; and that the Bank was not obligated to risk long term devaluation of the *5 property by renting to a different class of tenant. Plaintiff contends that Shean's testimony about responses to her attempts to market the property was inadmissible hearsay. We need not decide that question, because we conclude that any error was harmless. Common sense need not be ignored by the judge as factfinder any more than by a jury. The trial judge was entitled to conclude that the presence of the entire police headquarters, including persons in custody who would be transported through common areas of the building, would chill the market for space in the building.
Nevertheless, the judge did not address the undisputed fact that the second, third, fourth, and fifth floors had been vacant during the three years prior to the police department's occupancy, nor did he explain why he did not allocate some responsibility for the continued vacancy of the second, third, and fourth floors to causes other than the fifth floor occupant. He simply concluded:
I find that as a direct result of the police department overstaying its visit the second, third and fourth floors have remained vacant.
The implicit allocation of 100% responsibility to the Borough does not meet the requirements of R. 1:7-4.
By agreeing to the police department's temporary occupancy from February 1993 through February 1995,[6] defendant accepted the responsibility and risk of the continued vacancy of the middle three floors. The judge did not explain how he concluded that the holdover occupancy from February 1995 through July 1996, wrongful as it was, constituted the sole proximate cause of the continuing vacancies that began in 1990. In the absence of any explanation for the conclusion that plaintiff is solely responsible for lost profits on the three vacant floors, we can only speculate. Such speculation is an unacceptable basis for appellate review. Curtis v. Finneran, 83 N.J. 563, 569-70, 417 A.2d 15 (1980) (failure of a trial court to state its factual and legal findings "constitutes a disservice to the ... appellate court") (quoting Kenwood Assocs. v. Board of Adj. of City, of Englewood, 141 N.J.Super. 1, 4, 357 A.2d 55 (App.Div.1976)).
Rinaldi agreed that the police presence would affect the marketability of the rest of the building. However, he was the only witness who testified that the lengthy period of vacancy before the police moved into the fifth floor demonstrated that the holdover was not the sole cause of defendant's failure to lease the second, third, and fourth floors. He could not apportion responsibility. Nonetheless, except in special circumstances, where there is evidence of another proximate cause of the ultimate injury and where the defendant has better access to the relevant proofs, it is the claimant's and not the defendant's burden to apportion responsibility. See Goodman v. Fairlawn Garden Assocs. Inc., 253 N.J.Super. 299, 305, 601 A.2d 766 (App.Div.), certif. denied, 130 N.J. 7, 611 A.2d 647 (1992) (plaintiff injured in successive accidents had burden of proving allocation of responsibility). As we said in Goodman,
Apart from serving to protect implicated defendants against liability for injuries they did not cause, the logic of our decision lies in the fact that in the ordinary case of an aggravated preexisting injury only the plaintiff can know and describe the extent of the preexisting disability and the extent to which it has been exacerbated. Whatever knowledge a defendant may have about these crucial facts it must learn from the plaintiff. In the case of a unitary injury caused by concurrent negligence, the plaintiff is naturally relieved of this burden because of the joint liability which is the usual concomitant of concurrent negligence.

[Id. at 305-306, 601 A.2d 766].
We do not intend to identify or limit particular causes of action in which the burden of apportioning damages may properly be shifted to the party or parties defending a claim. We merely stress the absence of circumstances to justify shifting the burden in this case. Our courts have done so only in circumstances where the evidence suggests an *6 injury caused by more than one factor, and information essential to proving comparative responsibility is more within the control of the defendant(s) than the plaintiff. See, e.g., Fosgate v. Corona, 66 N.J. 268, 272-73, 330 A.2d 355 (1974) (effects of tuberculosis were significantly worsened by defendant doctor's negligently delayed diagnosis); Bendar v. Rosen, 247 N.J.Super. 219, 232-34, 588 A.2d 1264 (App.Div.1991) (therapeutic abortion with resulting damages was necessitated by combined circumstances of pregnancy after negligently performed tubal ligation, and auto accident that required an x-ray while the pregnancy was unknown). See also NOPCO Chemical Div. v. Blaw-Knox Co., 59 N.J. 274, 282-83, 281 A.2d 793 (1971) (manufacturer, carriers, and bailees successively handled machine that was delivered in damaged condition and plaintiff's inability to identify the responsible party warranted shifting the burden of proof rather than dismissing plaintiff's claim); Sholtis v. American Cyanamid Co., 238 N.J.Super. 8, 27-28, 568 A.2d 1196 (App.Div.1989) (plaintiff's work exposure to asbestos from numerous sources that combined to cause disease). As we noted in Sholtis, "in the case of a cumulative injury, ... we see no antipathy in New Jersey to the shifting of the burden of proof." Id. at 28 & n. 15, 568 A.2d 1196.
Here the preexisting condition, three vacant floors in a commercial building with concomitant loss of rental income, undoubtedly was aggravated by the police department's holding over. Whatever the reasons for the original vacancy, those reasons and their continuing effect were more within the Bank's knowledge than Fort Lee's. Yet the Bank failed to address that condition at trial. The situation cannot accurately be described either as "an injury and aggravation thereof," or as "an indivisible injury caused by a defendant's negligence concurrently with other causative factors." See Goodman, supra, 253 N.J.Super. at 305, 601 A.2d 766. However, the general principle we emphasized in Goodman guides us. "[O]nly the plaintiff can know and describe the extent of the preexisting [condition]...." Id. Thus the Borough's inability to apportion causation should not relieve the Bank of its ultimate burden.[7] By finding that the trespass was the proximate cause of the Bank's lost rents. The trial judge effectively placed the burden of allocation on the party defending the damage claim. That was error.
We now address the issue of damages. Damages need not be proved with precision where that is impractical or impossible. First Nat. Bank of Chicago v. Jefferson Mortg. Co., 576 F.2d 479, 494-95 (3rd Cir.1978); American Sanitary Sales Co., Inc. v. State, Dept. of Treasury, Div. of Purchase and Property, 178 N.J.Super. 429, 435, 429 A.2d 403 (App.Div.), certif. denied, 87 N.J. 420, 434 A.2d 1094 (1981). So long as the record supports a reasonable estimate of damages, based upon more than mere speculation, a damage award can be affirmed. American Sanitary Sales, supra, 178 N.J.Super. at 435, 429 A.2d 403 ("Evidence affording a basis for estimating damages with some reasonable degree of certainty is sufficient to support an award of compensatory damages.") (quoting Paolicelli v. Wojciechowski, 132 N.J.Super. 274, 278-79, 333 A.2d 532 (App.Div.), certif. denied, 68 N.J. 153, 343 A.2d 441 (1975)). Where the judge makes the award, the judge must explain the reasons therefor. "In civil actions tried without a jury ... the court shall, by an opinion or memorandum decision, either written or oral, find the facts and state its conclusions of law thereon." R. 1:7-4. We find insufficient explanation of the judge's reasons with respect to the calculation of lost profits.
We also find legal error in the determination that the cost of essential building repairs, required as a precondition to leasing this property to "class B" tenants, should not be factored into overhead that reduces defendant's net profit and thus the damages due from plaintiff. The trial judge gave this explanation for excluding repair costs entirely from the calculation of lost profits:

*7 The cost of repairs will not be deducted from the rent due defendant Bank because the repairs have to be made eventually regardless of whether rented, or even if sold, deducted from the sales price.
That explanation is inadequate and illogical.
The repair issue arises in two different contexts raised by plaintiff. The two must not be confused. The repair issue arises first because plaintiff seeks to charge defendant with a failure to mitigate its damages by actively "marketing" the property, and contends that defendant's failure to undertake necessary building repairs evidences its violation of the duty to mitigate. It is undisputed that a commercial landlord must make reasonable efforts to mitigate its damages after a tenant breaches the lease. McGuire v. City of Jersey City, 125 N.J. 310, 320-21, 593 A.2d 309 (1991); Fanarjian v. Moskowitz, 237 N.J.Super. 395, 405-06, 568 A.2d 94 (App.Div.1989). Whether or not the landlord's efforts were reasonable is a question for the trier of fact. Ingraham v. Trowbridge Builders, 297 N.J.Super. 72, 84, 687 A.2d 785 (App.Div.1997).
The court concluded that the police department's presence so chilled the leasing market for the property that it would have been fruitless to invest in necessary repairs to the building until defendant could be assured that plaintiff would vacate. The court's ruling in this respect is sufficiently supported by the evidence and will not be disturbed. See Fanarjian, supra, 237 N.J.Super. at 406, 568 A.2d 94. The record supports the judge's conclusion that defendant was not obligated to invest in repairs while plaintiff's presence made the premises undesirable to potential lessees, or to risk lowering the long term value of the property by leasing to less discriminating class C tenants. The judge concluded that it was the continued presence of the police department, unconsented to after February 1, 1995, that reasonably postponed defendant's investment in the necessary improvements to the building. That was the trial judge's call to make. See Ingraham, supra, 297 N.J.Super. at 84, 687 A.2d 785. It is not for us to weigh the evidence, so long as there is sufficient evidence in the record as a whole to support the trial judge's conclusion. Rova Farms Resort, Inc., supra, 65 N.J. at 483-84, 323 A.2d 495. We so find and therefore do not interfere with the judge's determination that the Bank did not fail to act reasonably to mitigate damages.[8]
However, the repair issue in the context of calculating net lost profits is quite a different matter. Experts for both sides agreed that appropriate Class B tenants would be unlikely to lease space in the building until certain repairs were completed or scheduled for completion. Indeed, both Shean and Rinaldi agreed that the gross market value per square foot assumed the building in full repairstructurally and cosmetically. Just as it was logical not to require defendant to invest in repairs when the police presence made it unlikely that defendant could earn a profit from the repaired property, so it was illogical to assume defendant could earn a profit without incurring the cost of the repairs required to rent the space.
In support of the total exclusion of necessary repair costs, defendant cites Zippertubing Co. v. Teleflex, Inc., 757 F.2d 1401, 1412 (3rd Cir.1985). That case stands for the undisputed proposition that fixed overhead expenses, which do not vary with individual transactions, should not be deducted in calculating lost profits. We agree. That is why it was correct for the judge to omit real estate taxes from the expenses attributable to leasing.[9] But Zippertubing does not support the proposition that repairs essential to make a product saleable at the claimed price should not be included in some manner in calculating overhead.
*8 We agree that it was plaintiff's burden to introduce evidence of essential repairs. Plaintiff did so, and defendant's witnesses agreed to the necessity of at least some repairs. The precise extent of essential repairs, and their cost, is not determinable from this record. However, there is clear evidence that significant repairs were essential to leasing the space at the market rates described. Plaintiff's witnesses included Joseph D'Alessio, an experienced investor who attempted to purchase the property from defendant in the spring of 1995. He testified that he actually had a contract to purchase the property for $4.325 million, an amount he was willing to pay based upon engineering reports he obtained in the course of his due diligence examination. The reports showed "that we had about approximately to put the building back in shape a million 800,000[10] dollars worth of work to do." The deal did not go through for unrelated reasons.
Plaintiff's expert, Anthony Rinaldi, testified to his inspection of the property in May 1996. His photos of several areas of the property were accepted in evidence. He described needed structural repairs to the parking deck, based upon visible flooding and rusting, and to the roof, where signs of leaks and rusting around the air-conditioning and ventilating equipment ("chillers") were visible. He also described necessary repairs to the fountain at the front of the building, the bathrooms, and the lobby; however, he did not offer evidence of the cost of any of these.
Defendant's expert, Anne Shean, said she was familiar with the current condition (as of July 1, 1996) of the building. When asked to describe the condition of the building generally, Shean answered:
A. Well, there is some deferred maintenance. In particular the front area that needs to be corrected quickly before it becomes a serious problem so there needs to be money put in there.... Depending upon the direction that the building went in would determine how much one would actually spend to fix the building up which is why it's an idea[l] time for us to sell it because that buyer should make the decision. One could put 3 million dollars in there or one could put a million dollars in there. Depending upon the direction that you wanted to take the building and how high end you wanted to position it.
The only "pressing" repair she cited was
the front stairs have been allowed to have deteriorated. This winter was really bad with the salt application, the number of snows and the freezing that the membrane has failed what's called the water proofing has failed and there needsthe stairs need to be torn out and a new water proofing put in below the front stair area.
Dennis McConnell, another defense expert on commercial leasing, described "deferred maintenance" and a need for repairs, "[a] lot of it cosmetic in nature." He also noted that "in the lowest level of the parking garage there seems to be a water problem." He said he was not an engineer and did not review any engineering studies. But he agreed that the owner would have to spend money for repairs "to attract the right tenant."
Finally, John Louizides testified that he inspected the building in 1993 when his firm, defendant DBR Management, was appointed rent receiver for the property. He said he had not seen any engineering reports and could not answer as to structural repairs, "but there were some cosmetic repairs [he] thought might be necessary or obvious." He described "[t]he only major repair [in 1996] was repair to the sprinkler system, the dry sprinkler system .... the mechanical, H V A C, the elevator, they seem to be functioning. We had no problem with the plumbing." However, he testified that "cosmetic work was definitely necessary." He also noted water seepage from the street level down to levels A, B, and C of the underground parking areas that "damaged some of the police vehicles and their employee cars that were on site at one point."
Because the Chancery Judge concluded that no reduction for repairs would be considered, he did not address the inadequacy of the bank's proofs with respect to repair *9 costs. As Judge Brochin wrote for this court in Cromartie v. Carteret Sav. & Loan, 277 N.J.Super. 88, 103, 649 A.2d 76 (App.Div. 1994) (reversing an award of lost rents where the landlord failed to include proof of its costs as part of its damage claim):
Carteret also objects to the inclusion of lost rents in the damage award on the ground that the Cromarties did not prove their expenses in operating the property and therefore did not prove their lost profits. We agree. To recover lost profits, a party must show that profits were lost as a result of the actionable conduct complained of. "Lost profits" signifies the difference between gross income and the costs or expenses which had to be expended to produce the income. Proof of the relevant costs or expenses is not a matter of mitigation. It is part of the damage case of the party seeking recovery for lost profits. J.L. Davis & Associates [v. Heidler], 263 N.J.Super. 264, 275-77, 622 A.2d 923 (App. Div.1993) and cases cited therein; 5 Corbin on Contracts § 1023 (West 1964). The failure to require the plaintiffs in the present case to prove their relevant expenses, or to show that their inability to produce the proof was the consequence of Carteret's conduct, was also error. [Emphasis added.]
We conclude that it was error to award lost rents without taking into account the cost of essential repairs. In light of the inadequate proof of repair costs in the record, and the fact that defendant's burden to produce such evidence was not addressed by the parties or the court, defendant shall be permitted to supplement the record on remand with such evidence. Plaintiff shall of course have the opportunity to respond, and a discovery schedule shall be set by the court. We do not suggest that a dollar for dollar reduction of gross rents is the appropriate means of taking necessary repairs into account. We suggest, as but one rational approach, the capitalization of repair costs over an appropriate number of years, thus reducing gross rental income by a reasonable share of such costs. Cf. Inmar Associates, Inc. v. Borough of Carlstadt, 112 N.J. 593, 607, 549 A.2d 38 (1988) (suggesting capitalization of the cost of required environmental cleanup as a method "containing the seeds of useful doctrine" in assessing the value of contaminated property for real estate tax purposes).
The plaintiff is justified in arguing that the judge did not adequately explain his determination of "lost rents" in other respects. The judge made the following determinations of lost profits, i.e., net rent:
The Bank is entitled to damages for lost rent from August 1, 1995 to the present at $15 per square foot. Because it could take 2 to 3 years to lease all 3 vacant floors, the Court will apply a gradual lease up curve. Each floor is 14,200 square feet. 14,200 square feet times $15 equals 213,000 per year divided by 12 equals 17,750 per month per floor for the 3 vacant floors. The police should have been paying $18 per square foot. 14,200 square feet times $18 equals $255,600 divided by 12 equals $21,300 per month. The police should have been paying that from August 1, 1995 to July, 1996 that is the present time or 12 months at $21,300 equals $255,600 less whatever the Borough has paid in that 12 months.
It is difficult to determine when the other floors would have been rented. However, since the Borough caused them to be vacant, it should not be heard to complain that the damages cannot be fixed precisely. Actually I should assess $15 per square foot for all 3 vacant floors and place the burden on the Borough to prove otherwise. But again the Court will give the benefit of the doubt to the citizens of Fort Lee.
If the Borough had vacated in February, 1995 or at least promised to vacate in a few months, the Bank could have done the necessary repairs for occupancy as of August 1, 1995. I find that one of the vacant floors would have been leased by August 1, 1995 and therefore the Bank lost 12 months or one year's rent to July, 1996 in the sum of $213,000 which is 12 months times $17,750.
I find that a second vacant floor would have been leased as of January 1, 1996. The Bank therefore lost other 7 months *10 rent through July, 1996 or $124,250 which is 7 months times $17,750.
Finally as a condition for remaining on the premises, the Borough will have to pay what would have been the rent for the third vacant floor as of August 1, 1996. If the Borough is going to occupy virtually the entire building it will have to pay for the entire building.
The Bank is therefore entitled to the following damages for lost rent or lost use and occupancy, lost rent I suppose, through July, 1996.
For the fifth floor occupied by the police, the Bank is entitled to $65,004. That's arrived at as follows: The yearly rent of $255,600 less a credit of $190,596. I credited the Borough with $15,883 per month because the Borough pays $9,883 plus a $6,000 credit for utilities. And 12 times that is as I said $190,596. So again the damages to the Bank for the fifth floor occupied by the police as of now July, 1996 is $65,004.
And for the first vacant floor, I don't mean the first floor of the building, but in my earlier analysis the first vacant floor the Bank is entitled to $213,000. And for the next vacant floor $124,250 so the total damages for lost rent through this month, July 1996, is $402,254.
We find no error in the trial judge's application of a "gradual lease up curve" to account for the time it would take to lease all three vacant floors. We have difficulty, however, reconciling the judge's recognition that "it could take two to three years to lease all three vacant floors," with his conclusion that had the police department vacated when it should have, one floor would have been rented by August 1, 1995, another floor by January 1, 1996 and the third by August 1, 1996.
We do not discount the possibility that on remand, the court may conclude that the conditions responsible for the vacancy in 1990-93, other than repairs, had been resolved by July 1995. In that case, allowing an appropriate "lease-up curve" would fairly address our concerns respecting proximate cause and comparative causation and would effect an apportionment of responsibility consistent with our opinion.
The Borough cites several errors or omissions in the trial judge's calculation of lost rents. First, plaintiff contends that the judge did not explain his conclusion that the gross market rate for the space was $20-21. The court heard testimony from three expert witnesses for the Bank and one expert for the Borough with respect to the gross market rental value and with respect to the appropriate deductions for overhead expenses, to reach net lost rent or profit. All the expert witnesses agreed that whatever the gross market rate, it would assume approximately $3 per square foot at the landlord's expense as "tenant fit-up" to tailor the space to the tenant's use. Only McConnell described a rental rate more than $18. He testified to $20 to $21 as the "asking" rate. Shean was of the opinion that the gross market rental rate for the property was $18, and that $3 per square foot for tenant fit up left net rent at $15 per square foot. Rinaldi described the gross market rate for the space at $18.[11] The judge did not explain why he accepted McConnell's higher figure, reduced by tenant "fit up" to $18, instead of $18 reduced to $15.
Plaintiff also challenges the judge's deduction of only $3 per square foot as overhead expenses to reach "net rent." We are not convinced that the evidence supports the judge's conclusion that net expenses attributable to the leased space were fairly established at only $3, leaving what may be an overstated net profit of $15 per square foot. Only the Borough's expert, Anthony Rinaldi, detailed the amounts per square foot attributable to each expense category. Rinaldi, whose testimony regarding expenses was not countered by any of defendant's witnesses, testified to the following expenses for the factors he identified:

*11
janitorial (.75) and maintenance (.75) $1.50
real estate commissions $ .90[12]
(at 5% gross rent)
management fees $ .54
(at 3% gross rent)
utilities $1.50
(other than tenant electric)
reserve for future repairs $ .50
 ___________
 $4.94[13]
Although the judge cited "the testimony of Mr. Rinaldi" in support of the $3 per square foot expense deduction "to reach a net rent," the judge never explained how he arrived at the figure. Our review is hampered because the judge did not explain his reasons for the $3 allowance for expenses. We cannot determine whether the judge excluded one or more of the five components Rinaldi included to reach an expense total of $4.94 per square foot; or whether the judge reduced the amount he attributed to certain components; or whether he arbitrarily discounted the total to reduce $4.94 to $3. Certainly the judge was free to reject any portion of Rinaldi's testimony. But having expressly relied on Rinaldi to calculate expenses, the judge was obligated to explain his reasons for picking and choosing from Rinaldi's testimony, if that is what he did, and for his own calculation of overhead expenses. See Curtis v. Finneran, supra, 83 N.J. at 568-70, 417 A.2d 15. This is not a case where we can glean findings from the judge's oral opinion, as we did in Paris of Wayne v. Richard A. Hajjar Agency, 174 N.J.Super. 310, 316, 416 A.2d 436 (App.Div.), certif. denied, 85 N.J. 454, 427 A.2d 555 (1980).
The failure to address comparative causation, the omission of any repair factor, and the insufficient explanation of the calculation of lost profits, require that we vacate the challenged portion of the lost rent award, $337,250, and remand to the Chancery Division to consider an allocation of proximate cause, to take into account the factor of essential repairs, to determine the reasonable overhead expense per square foot, and to enter a modified damage award reflecting lost profits proximately caused by plaintiff's trespass. On remand, the court may in its discretion allow further evidence to supplement the existing trial record. In any event, the court shall make adequate findings and shall explain the reasons for its decision, in accordance with R. 1:7-4.
We affirm the balance of the judgment. We do not retain jurisdiction.
NOTES
[1] Defendants Fort Lee Headquarters Limited Partnership and Red Rock Holdings Limited were the owner or owners of the premises.
[2] $65,004 plus $337,250 total $402,254, the amount reflected in the Chancery Division judgment as "lost rent."
[3] Plaintiff also appeals the denial of its motion for reconsideration, which was decided by the Assignment Judge after the trial judge's retirement. In light of our decision, that aspect of plaintiff's appeal is moot.
[4] The owner, Fort Lee Headquarters Limited Partnership, was controlled by Menachem Pri-Har, who also controlled Red Rock Holdings, Ltd. In 1992, the Bank as mortgagee commenced a foreclosure proceeding, and in March 1993 DBR was appointed by the court as rent receiver for the property. The Bank obtained a judgment of foreclosure and thereafter purchased the building at a sheriff's sale on April 3, 1996. In the meantime, Pri-Har had been convicted of bank fraud and related felonies in the United States District for the Southern District of New York and sentenced to fourteen years in prison. His conviction was affirmed in United States v. Pri-Har, 47 F.3d 1157 (2d Cir.), cert. denied, 514 U.S. 1052, 115 S.Ct. 1431, 131 L. Ed.2d 312 (1995).
[5] We were informed at oral argument that the second, third, fourth, and fifth floors still have not been leased and that the bank has decided to sell rather than lease the building.
[6] The Chancery judge gave the Borough "the benefit of the doubt" and found the bank's notice to quit implicitly extended the occupancy to August 1, 1995.
[7] Nor should our finding that the Bank did not fail to mitigate damages excuse the Bank from the burden of apportioning causation. "[A]pportionment is, however, entirely possible where some part of the damage may reasonably and conveniently be assigned to an innocent cause." W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 52, at 349 (5th ed.1984).
[8] The judge also rejected plaintiff's contention that defendant could have sold the property, and therefore was not entitled to damages for rent. We will not interfere with that determination.
[9] In its reply brief, plaintiff persists in seeking credit for $6.44 per square foot in overhead expenses, although plaintiff does not otherwise argue the tax issue. Rinaldi estimated total expenses at $6.44 including real estate tax at $1.50 per square foot. Rinaldi's estimate without real estate tax was $4.94 per square foot.
[10] We cannot clearly determine from the transcript as written whether D'Alessio actually said "$1,800,000," or "$1,000,000 [pause] $800,000." In any event, the amount was substantial.
[11] Plaintiff offers no evidence to support its contention that the market rates described by the expert witnesses in 1996 were inapplicable to periods in 1995 for which lost rents may be due.
[12] To the extent that the court found gross rent to be $20-21 per square foot and not the $18 Rinaldi described, real estate commissions at 5% would be more than $.90 per square foot, and management fees would be more than $.54.
[13] Rinaldi testified that an additional $1.50 would represent the per square foot share of the real property tax. However, he agreed that the entire tax is due irrespective of vacancy or occupancy. The judge properly excluded the tax expense from his calculations of lost profits, and plaintiff does not dispute that issue on appeal.