# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MICHELLE ALTIERI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2021-0946-KSJM |
| | ) | |
| KIMBERLY ALEXY, SARA | ) | |
| ANDREWS, RONALD E. F. CODD, | ) | |
| ARTHUR W. COVIELLO, JR., | ) | |
| KEVIN MANDIA, ADRIAN | ) | |
| MCDERMOTT, VIRAL PATEL, | ) | |
| ENRIQUE SALEM, ROBERT E. | ) | |
| SWITZ, and MANDIANT, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

1. Defendant Kevin Mandia formed Defendant Mandiant, Inc. (the "Company") in 2004 to provide incident response services to companies that experience data security breaches. The Company embarked on a merger and acquisition strategy to grow the original business. This Order refers to the Company's original business line as "Old Mandiant."

2. The Company combined with FireEye, Inc. on December 30, 2013. The combined entity initially took the FireEye name but later changed it back to Mandiant. This Order refers to the FireEye line of business, including goodwill and associated intangible assets, as the "FireEye Business." Whereas Old Mandiant focused on incident response and consulting services, the FireEye Business created products designed to detect

and prevent cyberattacks. Combining with FireEye allowed the Company to both "detect[] attacks" and also "respond[] to attacks[.]"[1]

3.     The Company acquired other businesses in 2016—iSight Partners, which was in the business of gathering information "about hacker groups and other cybersecurity risks,"[2] and Invotas International Corp., which provided "security automation and orchestration technology."[3]  Also in 2016, Mandia joined the Company's Board of Directors (the "Board") and replaced David DeWalt as CEO.

4.     The Company's revenue increased between 2016 and 2020.  During this period of growth, the FireEye Business was significant to overall business.  In 2019 and 2020, the FireEye Business accounted for 62% and 57% of the Company's overall revenue, respectively.[4]  Further, the Company's Form 10-Q for the fiscal quarter ended June 30, 2021, listed $1 billion in goodwill, approximately $500 million of which is alleged to be attributable to the FireEye Business.[5]  The FireEye Business also had a strong social media presence relative to Mandiant's other offerings.  In 2021, however, the Board projected that the FireEye Business would decline as a percentage of overall revenue—forecasted down to 48% in 2022 and 42% in 2023.[6]

---

[1] C.A. No. 2021-0946-KSJM, Docket ("Dkt.") 1 ("Compl.") ¶ 19.

[2] *Id.* ¶ 20.

[3] *Id.* ¶ 21.

[4] *Id.* ¶ 32.

[5] *Id.* ¶ 31; *see also* FireEye, Inc., Quarterly Report (Form 10-Q) (August 9, 2021) ("Aug. 9 Form 10-Q").  The Complaint incorporates the contents of the August 9 Form 10-Q by reference.  *See* Compl. ¶ 31 n.11.

[6] Compl. ¶ 32.

5. On May 10, 2021, Mandia sold 150,000 shares in the Company, pursuant to a trading plan, for $20.06 per share—a total of about $3 million. Mandia had sold no shares in 2020 and sold only 15,781 shares in 2019.

6. On June 2, 2021, the Company sold the FireEye Business to Symphony Technology Group ("STG") for $1.2 billion (the "Sale"). Mandia described the Sale as an opportunity to let Mandiant "concentrate exclusively on scaling our intelligence and frontline expertise[.]"[7] He stated that the FireEye Business would fare better with STG, as STG was focused on "fueling innovative market leaders in software and cybersecurity[.]"[8] The Company did not seek stockholder approval of the Sale.

7. In reaction to the announcement of the Sale, the Company's stock dropped by 17.62%.[9] Financial analysts who covered the Company expressed concern about the Company's "lower gross margin and stability" absent the FireEye Business, noting that "the realized price for [the Company's] product portfolio is less than we would have expected."[10]

8. Plaintiff Michelle Altieri ("Plaintiff") is a stockholder of the Company. On November 3, 2021, Plaintiff brought this action challenging the Sale, asserting claims against the Company and its Board members, Defendants Mandia, Kimberly Alexy, Sara

---

[7] Id. ¶ 25.

[8] Id.

[9] Id. ¶ 26.

[10] Id. ¶¶ 27–28.

Andrews, Ronald E. F. Codd, Arthur W. Coviello, Jr., Adrian McDermott, Viral Patel, Enrique Salem, and Robert E. Switz (together, the "Director Defendants").

9. The Complaint asserts three causes of action. In Count I, Plaintiff seeks to void the Sale under 8 *Del. C.* § 271, arguing that the Sale was a "sale of all or substantially all" of Mandiant's assets but that the Board failed to put it to a stockholder vote as required by Section 271.[11] In Count II, Plaintiff claims that the Director Defendants breached their fiduciary duties by knowingly failing to obtain a stockholder vote as required by Section 271. In Count III, Plaintiff claims that Mandia breached his fiduciary duties to the Company by trading on material, non-public information ahead of the Sale and by approving the Sale. On July 29, 2022, Plaintiff withdrew the portion of Count III alleging a breach of fiduciary duty through stock trading.[12] As relief, Plaintiff seeks declaratory judgment in her favor, an injunction compelling a stockholder vote on the Sale, and attorneys' fees.[13]

10. Defendants have moved to dismiss the Complaint pursuant to Court of Chancery Rules 12(b)(6) and 23.1.[14] The parties briefed the motion and the court heard oral argument on February 24, 2023.[15] Because Defendants' Rule 12(b)(6) arguments are dispositive, this Order does not reach the Rule 23.1 arguments.

---

[11] *Id.* ¶¶ 39–48.

[12] *See* Dkt. 42 ("Pl.'s Answering Br.") at 28 n.18.

[13] *See* Compl. at 16.

[14] *See* Dkt. 18.

[15] Dkts. 54, 55 (Feb. 25, 2023 Hr'g Tr.).

11. Under Delaware law, the governing pleading standard to survive a motion to dismiss under Rule 12(b)(6) is reasonable conceivability.[16] When considering such a motion, the court must "accept all well-pleaded factual allegations in the [c]omplaint as true . . . , draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[17] The court need not, however, "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[18]

12. In Count I, Plaintiff claims that the Company breached Section 271, which requires a stockholder vote on any "[sale], lease or exchange all or substantially all of its property and assets, including its goodwill and its corporate franchises."[19] Defendants argue that Count I fails to state a claim because the Sale did not constitute a sale of "substantially all" the Company's assets under Section 271.[20]

13. Under *Gimbel v. Signal Companies, Inc.*,[21] the court must evaluate "the quantitative and qualitative importance of the transaction at issue" to determine what

---

[16] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

[17] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[18] *Price v. E.I. du Pont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011), *overruled on other grounds by Ramsey v. Georgia S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1277 (Del. 2018) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

[19] 8 *Del. C.* § 271(a).

[20] *See* Dkt. 18 ("Defs.' Opening Br.") at 16.

[21] 316 A.2d 599 (Del. Ch. 1974); *see also Hollinger Inc. v. Hollinger Int'l, Inc.*, 858 A.2d 342, 379 (Del. Ch. 2004) (citing *Gimbel*, 316 A.2d at 606); *Winston v. Mandor*, 710 A.2d

constitutes "substantially all" of a company's assets for purposes of Section 271.[22] The purpose of the *Gimbel* analysis is to determine whether the transaction "struck 'at the heart of the corporate existence and purpose,' in the sense that it involved the 'destruction of the means to accomplish the purpose or objects for which the corporation was incorporated and actually performs.'"[23]

14.     When evaluating quantitative metrics, no one factor is necessarily dispositive.  Courts consider data points such as the revenue generated by the assets sold as a percentage of total company revenue, the percentage of book value of the sale, the contribution of the assets sold to the company's overall EBITDA, and future earnings potential.[24]  "[T]he transaction must be viewed in terms of its overall effect on the corporation, and there is no necessary quantifying percentage."[25]

15.     When evaluating qualitative metrics, the court focuses on "economic quality and, at most, on whether the transaction leaves the stockholders with an investment that in economic terms is qualitatively different than the one that they now possess."[26] For Section

835, 843 (Del. Ch. 1997) ("The Supreme Court has long held that determination of whether there is a sale of substantially all assets so as to trigger [S]ection 271 depends upon the particular qualitative and quantitative characteristics of the transaction at issue.").

[22] *Hollinger*, 858 A.2d at 379.

[23] *Id.* (quoting *Gimbel*, 316 A.2d at 606) (internal quotation marks omitted).

[24] *See Hollinger*, 858 A.2d at 379–82.

[25] *Winston*, 710 A.2d at 843.

[26] *Hollinger*, 858 A.2d at 384 (citing *Gimbel*, 316 A.2d at 606).

271 to apply, the sale must be "out of the ordinary and substantially affect[] the existence and purpose of the corporation[.]"[27]

16. When considered quantitatively, the Sale does not satisfy the substantially-all test. The Company's public filings indicate total assets of approximately $3.245 billion as of December 2020 and $3.14 billion as of June 30, 2021.[28] The Sale, which was for $1.2 billion, is 37.5% and 38.2% of each figure, respectively.[29] These percentages fall short of the substantially-all threshold from a quantitative perspective.[30]

17. When considered qualitatively, the Sale does not satisfy the substantially-all test. Although the FireEye Business was an important aspect of Mandiant, Plaintiff has not pled that it affects the "existence and purpose" of the Company.[31] Mandiant was a cybersecurity company before the Sale. It is a cybersecurity company after the Sale. Although selling the FireEye Business may alter course in how the Company operates, the change is not qualitatively so significant as to "strike a blow" to Mandiant's "heart."[32]

---

[27] *Gimbel*, 316 A.2d at 606.

[28] *See* Dkt. 18, Defs.' Ex. 1 at 54 (December 20, 2020 Form 10-K reflecting approximately $3.245 billion at Year End 2020); *see also* Aug. 9 Form 10-Q at 4 (reflecting total asset value of approximately $3.14 billion).

[29] In briefing, Defendants cite web sources purporting to show a market capitalization of over $5.3 billion on June 1, 2021. *See* Defs.' Opening Br. at 18, 18 n.8. On this basis, Defendants measure the $1.2 billion Sale as 23% of the Company's overall value. The link that Defendants cite, however, is no longer operational. For this and other reasons, the court does not rely upon this data for its decision. *See id.*

[30] *See Hollinger*, 858 A.2d at 377 ("A fair and succinct equivalent to the term 'substantially all' would [] be 'essentially everything.'").

[31] *See id.*

[32] *Id.* at 385.

Although the Sale was out of the ordinary, it does not satisfy the "substantially all" test from a qualitative perspective.

18. Plaintiff's position is that the Sale satisfies the substantially-all test because the FireEye Business accounted for 62% of Company revenue in 2019 and 57% in 2020.[33] Plaintiff cites four cases to support her position that these figures, when paired with qualitative factors, are sufficient.[34] All four cases are distinguishable.

19. In the first case, *Katz*, the court determined that the transaction satisfied the substantially-all test based primarily on qualitative factors. Quantitatively, the business line at issue, steel drums, represented only 51% of its remaining assets, 44.9% of its sales revenue, and 52.4% of its pre-tax net operating income.[35] Qualitatively, however, the challenged transaction constituted an effort by the company to shift its overall business strategy by "embark[ing] on the manufacture of plastic drums" that "represent[ed] a radical departure from [the company's] historically successful line of business, namely steel drums."[36]

20. *Katz* is distinguishable because the transaction at issue in this case did not represent a stark departure from the Company's historic line of business. The Company was born from the fusion of FireEye with Old Mandiant, which focused on cybersecurity

---

[33] *See* Pl.'s Answering Br. at 24.

[34] *See id.* at 23 (citing *Katz v. Bregman*, 431 A.2d 1274, 1275–76 (Del. Ch. 1981); *Thorpe v. CERBCO, Inc.*, 1995 WL 478954, at *9 (Del. Ch. Aug. 9, 1995); *B.S.F. Co. v. Phila. Nat'l Bank*, 204 A.2d 746, 750 (Del. 1964); *Winston*, 710 A.2d at 843).

[35] *Katz*, 431 A.2d at 1275.

[36] *See id.* at 1276.

8

services. Mandiant had several businesses prior to the Sale, only one of which was the FireEye Business. The Sale was not qualitatively transformative for Mandiant.

21. In the next two cases, *Thorpe* and *B.S.F.*, the court determined that the challenged transactions satisfied the substantially-all standard based on quantitative factors. In *Thorpe*, the Delaware Supreme Court affirmed this court's holding that a pipeline services provider's sale of a subsidiary pipeline services business satisfied the substantially-all test. The high court reasoned that the subsidiary accounted for 68% of the company's overall assets and was the holding company's "primary income generating asset[.]"[37] The Court of Chancery had held that, if the assets at issue were removed, the holding company "would have been left with a substantial amount of cash, a small subsidiary that was about to be liquidated, and a single operating company . . . that was minimally profitable."[38] In *B.S.F.*, the asset sale falling under Section 271 constituted 75% of the company's assets that were its "only substantial income [] producing asset[.]"[39]

22. *Thorpe* and *B.S.F.* are distinguishable because the quantitative metrics on which Plaintiff relies are much less compelling. Plaintiff rightly notes that the revenue metrics for the FireEye Business are close to the revenue metrics in *Thorpe* and *B.S.F.*, but Plaintiff ignores that the percentage of overall assets attributable to the FireEye Business is far smaller. The FireEye Business constituted approximately 38% of the Company's overall assets compared to 68% and 75% in *Thorpe* and *B.S.F.*, respectively. Also, by

---

[37] 676 A.2d 436, 444 (Del. 1996).

[38] *Thorpe*, 1995 WL 478954, at *9.

[39] *See B.S.F.*, 204 A.2d at 112.

contrast to both *Thorpe* and *B.S.F.*, Plaintiff has not pled facts indicating that Mandiant is unable to generate income in FireEye's absence; indeed, the Company generated total revenues of approximately $121.97 million in the fiscal quarter following the Sale.[40]

23. In the last case, *Winston*, the court held that it was reasonably conceivable that a sale satisfied the substantially-all standard based on qualitative and quantitative factors. There, the court interpreted a corporate certificate of designations entitling holders of preferred stock to convert their shares into a new security in the event the company disposed of substantially all of the company's assets. The court looked to case law interpreting Section 271 for guidance concerning the substantially-all standard. The plaintiff alleged that, qualitatively, the sale shifted the company's primary business from holding real property to holding real estate-related securities.[41] The plaintiff alleged that, quantitatively, the assets sold were 60% of the company's net assets.[42] Based on these allegations, the court held that it was reasonably conceivable that the sale was for substantially all of the company's assets.[43]

24. *Winston* is distinguishable in two ways. For one, the company had shifted its "primary business" from "the ownership and management of real property" to "the

---

[40] *See* Defs.' Opening Br., Ex. 25 at 37 (Form 10-Q for quarter ended September 30, 2021, describing Company revenues). The court may take judicial notice of this revenue figure. *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 n.28 (Del. 2004).

[41] *Winston*, 710 A.2d at 843.

[42] *Id.*

[43] *Id.*

10

holding of real estate[-]related securities and mortgages[.]"[44]  By contrast, as discussed above, the Company has not fundamentally changed its core practice in the cybersecurity space.  Moreover, the plaintiff in *Winston* alleged that the assets at issue constituted 60% of the company's net assets.[45]  Here, the FireEye Business indisputably constituted far less (approximately 38%) of the Company's net assets.

25.    Another decision of this court, *Hollinger*, supports dismissal.  There, then-Vice Chancellor Strine held that media company Hollinger International, Inc.'s sale of a major asset, the "*Telegraph* Group," did not satisfy the substantially-all test of Section 271.[46]  The *Telegraph* Group was the "single most valuable asset" that the company possessed, accounting for approximately 56–57% of the company's overall asset value.[47]  Qualitatively, the court reasoned that even after the sale of the *Telegraph* Group, "stockholders will remain investors in a publication company with profitable operating assets, a well-regarded tabloid newspaper of good reputation and large circulation, a prestigious newspaper in Israel, and other valuable assets.  While important, the sale of the *Telegraph* does not strike a blow to [the company's] heart."[48]  The Vice Chancellor reached this conclusion even assuming "that the *Telegraph* Group is the single most valuable asset that [the company] possesses[.]"[49]

---

[44] *Id.*

[45] *Id.*

[46] *See Hollinger*, 858 A.2d at 379.

[47] *Id.* at 379–80.

[48] *Id.* at 385.

[49] *Id.* at 379.

26. Here, the court's analysis is unchanged even crediting Plaintiff's description of the FireEye Business as the crown jewel of the Company, much as the *Hollinger* court credited the plaintiff's allegations concerning the *Telegraph* Group. Post-Sale, Company investors are still left with an investment in a cybersecurity company, much as investors in Hollinger International, Inc. retained their investment in a global media company even after the sale of the *Telegraph* Group. The elimination of the FireEye Business is similarly "important," but "does not strike a blow" to the Company's heart.[50]

27. Plaintiff attempts to distinguish *Hollinger* in several ways. First, Plaintiff observes that *Hollinger* was decided not on the pleadings, but rather, on a preliminary injunction record and thus with the benefit of fact discovery.[51] But the factual record did not drive the outcome of *Hollinger*, which was resolved as a matter of law. Second, Plaintiff views *Hollinger* as an outlier relative to the four cases on which Plaintiff relies.[52] But for reasons already discussed, those cases are distinguishable. Third, Plaintiff argues that the presence of strong qualitative factors weighing in her favor distinguishes *Hollinger*, which—unlike here—was not a close call on the qualitative dimension of the *Gimbel* test.[53] But the qualitative analysis does not weigh in Plaintiff's favor, as discussed above. The FireEye Business was one part of the Company's corporate identity, but the Complaint does

---

[50] *Id.* at 385.

[51] *See* Pl.'s Answering Br. at 24–25.

[52] *See id.* at 25.

[53] *See id.*

not support a reasonable inference that the FireEye Business was the "heart" of the Company's existence and purpose.[54]

28. Under the circumstances, Plaintiff has not adequately alleged that the Sale triggered the voting requirement of Section 271. Count I is dismissed.

29. In Count II, Plaintiff claims that the Director Defendants breached their fiduciary duties by approving the Sale without obtaining stockholder approval as required by Section 271. Invoking the Company's exculpatory charter provision adopted pursuant to 8 *Del. C.* § 102(b)(7) and *In re Cornerstone Therapeutics Inc., Stockholder Litigation*,[55] the Director Defendants argue for dismissal of Count II on the basis that Plaintiff was required, but failed, to plead that they acted in bad faith when approving the Sale.[56]

30. Because the Sale did not violate Section 271, Plaintiff's voting rights were not breached. Therefore, it is not reasonably conceivable that the Director Defendants acted in bad faith by failing to submit the Sale to a vote. Furthermore, Plaintiff has alleged no defect in the Sale process itself that would suggest bad faith. Accordingly, Count II is dismissed.

31. In Count III, Plaintiff seems to assert a claim for breach of the duty or loyalty or waste against Mandia in connection with the Sale, although Count III is not clearly pled as such.[57] Plaintiff argues that Mandia used the Sale to transform the Company into a

---

[54] *Gimbel*, 316 A.2d at 606.

[55] 115 A.3d 1173 (Del. 2015).

[56] Defs.' Opening Br. at 30–39.

[57] *See* Compl. ¶¶ 54–60.

vanity project. By pruning out the influence of the FireEye Business, Plaintiff alleges that Mandia turned the Company into something approximating what he originally founded.[58] Plaintiff argues that Mandia did so for his own ego rather than for the benefit of the Company.

32. This decision need not dilate extensively on the standard for pleading the claims at issue in Count III, because Plaintiff's vanity-project theory is wholly conclusory. It would take a lot of work to list all the allegations relevant to such a claim that are missing from the Complaint. Suffice it to say, Count III falls way short. It is therefore dismissed.

33. For the foregoing reasons, Defendants' motion to dismiss is granted in its entirety. Judgment is entered in favor of Defendants.

*/s/ Kathaleen St. J. McCormick*
Chancellor Kathaleen St. J. McCormick
Dated: May 22, 2023

---

[58] *See* Pl.'s Answering Br. at 6 (describing the Sale as a way for Mandia to "return the Company to his original vision for Old Mandiant").