273 N.J. Super. 231 (1994)
641 A.2d 1056
SAXON CONSTRUCTION & MANAGEMENT CORP., PLAINTIFF-RESPONDENT,
v.
MASTERCLEAN OF NORTH CAROLINA, INC., DEFENDANT-APPELLANT, AND FIRST INDEMNITY OF AMERICA INSURANCE CO., DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued April 11, 1994.
Decided May 4, 1994.
*232 Before Judges PETRELLA and BAIME.
*233 Henry F. Minnerop of Brown & Wood, admitted pro hac vice, argued the cause for appellant (Brown & Wood and Waters, McPherson, McNeill, attorneys; Mr. Minnerop and Glenn A. Farrell, on the brief).
Anthony J. Belkowski argued the cause for respondent (Peckar & Abramson, attorneys; Mr. Belkowski, on the brief).
The opinion of the court was delivered by BAIME, J.A.D.
Plaintiff Saxon Construction & Management Corp. (Saxon) instituted this action in the Law Division, seeking compensatory damages against defendant Masterclean of North Carolina, Inc. (Masterclean) for breach of contract. Masterclean filed several counterclaims. Following a non-jury trial, the Law Division concluded that Masterclean breached the contract, but that Saxon suffered no damages. Masterclean was awarded $26,119.22 in quantum meruit.
Masterclean appeals, contending that the Law Division erroneously refused to enforce a termination clause contained in the contract because it was said to violate public policy. The clause provided in pertinent part that if Masterclean breached the agreement but the cost of completion was less than the unpaid balance of the contract price, Saxon was obliged to pay it the difference. In a reported opinion, Judge Arnold reasoned that the termination provision discouraged Masterclean from performing its duty under the contract because if Saxon spent less money to complete the contract work, Masterclean would profit from its breach. Saxon Constr. & Management Corp. v. Masterclean, Inc., 273 N.J. Super. 374, 378-79, 641 A.2d 1129, 1131-32 (Law Div. 1992). The judge also found that the clause encouraged waste because it provided Saxon with a disincentive to mitigate damages upon Masterclean's breach. Masterclean argues that the parties freely bargained for the contract at arms length and that the court was obliged to enforce the agreement as written. It also claims that the Law *234 Division erred in its factual findings pertaining to the extent to which it performed its contractual obligation.
We agree with Judge Arnold's conclusion that the termination clause was unconscionable and against public policy. We are also satisfied that the judge's findings of fact were supported by substantial, credible evidence present in the record. We thus affirm the Law Division's judgment substantially for the reasons expressed by Judge Arnold.

I.
The salient facts are fully described in Judge Arnold's published opinion and need not be recounted at length here. Saxon, a general contractor, was awarded a contract to renovate the interior of four hospital buildings owned by the United States Veterans' Administration (VA). Pursuant to its contract with the VA, Saxon entered into a subcontract with Masterclean for asbestos abatement and removal. After Masterclean completed work on two of the buildings, Saxon, both by telephone and in writing, directed it to commence asbestos removal on the third phase of the project. Saxon also requested that Masterclean commence its predicate work and provide documentary submissions for VA approval, which was a prerequisite to timely commencement of the work on the third building.
Masterclean did not respond to this notification, nor did it commence performance of its contractual duties. As a result, Saxon repeatedly contacted Masterclean, requesting assurance of performance. No response was received, however, and Saxon thus declared Masterclean in default and advised it that, under the contract, it had four days to cure its deficiency. We need not describe in detail what occurred thereafter except to say that Masterclean's contrived explanations for failing to perform were ultimately rejected by Saxon. After terminating the contract, Saxon entered into a new agreement with another subcontractor to complete the abatement and removal of asbestos with respect to the remaining two VA buildings. It is undisputed that Saxon paid *235 the new subcontractor approximately $200,000 less than it would have been required to pay Masterclean had the defendant performed its obligation.
Based upon this evidence, Judge Arnold found that Masterclean had breached the subcontract with Saxon, but that Saxon had suffered no damages. Although the cost of completing the removal of asbestos following Masterclean's breach was less than the contract price, the judge denied Masterclean's counterclaim in which it sought the difference. As we noted earlier, Judge Arnold concluded that the termination clause was against public policy because it provided the defaulting party with a windfall, provided the subcontractor with an incentive to breach its agreement, and discouraged mitigation of damages. However, Masterclean was awarded the reasonable value of the services rendered.

II.
At issue here is Article 13 of the contract. That clause provides in pertinent part:
If the Subcontractor persistently or repeatedly fails or neglects to carry out the Work in accordance with the Contract Documents or otherwise to perform in accordance with this Agreement and fails within four days after receipt of written notice to commence and continue correction of such default or neglect with diligence and promptness, the Contractor may, and without prejudice to any other remedy he may have, terminate the Subcontract[,] take possession of all materials and finish the Work by whatever method he may deem expedient. If the unpaid balance of the Contract Sum exceeds the expense of finishing the Work, such excess shall be paid to the Subcontractor, but if such expense exceeds such unpaid balance, the Subcontractor shall pay the difference to the Contractor. [Emphasis added.]
The question presented is whether this termination clause violates public policy because it permits a defaulting party to profit by its breach of the agreement and discourages the innocent party from minimizing its losses.
We begin with the settled principle that parties bargaining at arms-length may generally contract as they wish. Marchak v. Claridge Commons, Inc., 134 N.J. 275, 281-82, 633 A.2d 531 (1993); Terminal Constr. Corp. v. Bergen County Hackensack *236 River Sanitary Sewer Dist. Auth., 34 N.J. Super. 478, 504, 112 A.2d 762 (App.Div. 1954), modified on other grounds, 18 N.J. 294, 113 A.2d 787 (1955); see also Life Ins. Co. v. Hocroft Assocs., 256 N.J. Super. 328, 332, 606 A.2d 1150 (Ch.Div. 1992). In the ordinary case, "courts should enforce contracts as made by the parties." Vasquez v. Glassboro Serv. Ass'n, 83 N.J. 86, 101, 415 A.2d 1156 (1980). Nevertheless, it is equally well recognized that our courts may refuse to enforce contracts that are unconscionable or violate public policy. Id. at 98, 415 A.2d 1156. No contract can be sustained if it is inimical to the public interest or detrimental to the common good. Driscoll v. Burlington-Bristol Bridge Co., 10 N.J. Super. 545, 575, 77 A.2d 255 (Ch.Div. 1950), modified on other grounds, 8 N.J. 433, 86 A.2d 201, cert. denied, 344 U.S. 838, 73 S.Ct. 25, 97 L.Ed. 652 (1952). In a variety of legal settings, our courts have declined to enforce contracts that violate statutes, promote crime, interfere with the administration of justice, encourage divorce, violate public morality or restrain trade. Vasquez v. Glassboro Serv. Ass'n, 83 N.J. at 99, 415 A.2d 1156; see also Karlin v. Weinberg, 77 N.J. 408, 390 A.2d 1161 (1978) (restrictive employment covenants between physicians are enforceable only to the extent they are reasonable); Solari Indus., Inc. v. Malady, 55 N.J. 571, 264 A.2d 53 (1970) (noncompetitive agreements are enforceable only if they do not injure the public); Staedler v. Staedler, 6 N.J. 380, 389, 78 A.2d 896 (1951) (agreement to sue for divorce or to make no defense to such a suit is illegal); 6A Corbin on Contracts §§ 1373-78 at 1-27 (1962); 14 Williston on Contracts §§ 1628-29 at 2-11 (Jaeger ed., 3rd ed. 1972).
Public policy "eludes precise definition and may have diverse meanings in different contexts." Vasquez v. Glassboro Serv. Ass'n, 83 N.J. at 98, 415 A.2d 1156. Its sources "include federal and state legislation and judicial decisions." Ibid. Although most of the decisions on the subject involve public rather than private rights, the virtue of the doctrine "lies in its flexibility of application." Fidelity Union Trust Co. v. Reeves, 96 N.J. Eq. 490, 493, *237 125 A. 582 (Ch. 1924), aff'd, 98 N.J. Eq. 412, 129 A. 922 (E. & A. 1925). While reported opinions furnish guides, "they rarely are compelling in precedent." Ibid.; see also Loesch v. Vassiliades, 17 N.J. Super. 306, 309, 86 A.2d 14 (App.Div. 1952). The United States Supreme Court has said that "a promise is unenforceable if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement." Town of Newton v. Rumery, 480 U.S. 386, 392, 107 S.Ct. 1187, 1191, 94 L.Ed.2d 405, 415 (1987). The doctrine is similarly defined in the Restatement (Second) of Contracts § 178(1) (1981). The factors to be considered in the balancing process include the parties' justified expectations, any forfeiture that would result if enforcement were denied, any special public interest in the enforcement of the particular term, the strength of the public policy involved, the extent to which that policy would be impaired or subverted, the seriousness of any misconduct involved and whether it was deliberate, and the connection between the misconduct and the terms. Restatement (Second) of Contracts § 178(2) and (3). The factors that "argue against enforcement [must] clearly outweigh the law's traditional interest in protecting the expectations of the parties, its abhorrence of any unjust enrichment, and any public interest in the enforcement of the particular term." Restatement (Second) of Contracts § 178 cmt. b.
Against this backdrop, we are in complete accord with Judge Arnold's conclusion that the termination clause is against public policy. Masterclean incorrectly characterizes the effect of the clause as merely limiting a contractor to its actual damages where its subcontractor has breached its agreement. The clause does much more, however. It encourages the subcontractor to breach its agreement where it knows that its services can be purchased at an amount less than the contract price. It provides the defaulting subcontractor with a windfall despite the express language sanctioning the subcontractor's termination for "repeated[] fail[ure] ... to carry out [its contractual duty]." And it *238 discourages the contractor from affirmatively seeking to minimize its losses by obtaining a substitute subcontractor at a lesser cost.
Our decisions have permitted a defaulting contractor to recover the reasonable value of its services, less a fair allowance to the owner for minor defects or omissions, where the breach was not willful and the deficiency in its performance was not so serious as to deprive the owner of the intended use of the property. See Power-Matics, Inc. v. Ligotti, 79 N.J. Super. 294, 303, 191 A.2d 483 (App.Div. 1963); Jardine Estates, Inc. v. Donna Brook Corp., 42 N.J. Super. 332, 337-38, 126 A.2d 372 (App.Div. 1956). Thus, a contractor who commits a breach after he has rendered part performance must make the injured party whole by payment of compensatory damages, but the "part performance rendered ... may be much more valuable to the defendant than the amount of the injury caused by the breach[,]" and in such case, to allow the injured party to retain the benefit without making restitution is "the enforcement of a penalty or forfeiture against the contract-breaker." Kutzin v. Pirnie, 124 N.J. 500, 512, 591 A.2d 932 (1991) (quoting Arthur L. Corbin, The Rights of a Defaulting Vendee to the Restitution of Installments Paid, 40 Yale L.J. 1013, 1013 (1931)). It is far different, however, to permit the defaulting contractor to profit from its breach by compelling the owner to funnel to it whatever savings it made by reason of its effort to minimize its losses. To require such a result would reward the wrongdoer for its lack of fidelity and penalize the innocent party for its effort to avoid waste.
The economic waste doctrine has its origin in compelling considerations of equity and justice. See Correa v. Maggiore, 196 N.J. Super. 273, 285, 482 A.2d 192 (App.Div. 1984). A contractual term that rewards a defaulting party by placing it in a better pecuniary position than it would have been had it performed its promise defeats common sense and encourages unreasonable economic waste. Cf. 525 Main St. Corp. v. Eagle Roofing Co., 34 N.J. 251, 254-55, 168 A.2d 33 (1961). Our strong public policy against unjust enrichment and economic waste would be seriously impaired were we to blindly enforce the termination clause heedless *239 to its unreasonable consequences. We agree with Judge Arnold's conclusion that these considerations clearly outweigh the law's traditional interest in enforcing a freely entered contract. We hold that Article 13 is void as against public policy under the circumstances presented in this case.

III.
Finally, we perceive no sound basis to disturb Judge Arnold's factual findings concerning the extent to which Masterclean performed its duties under the contract. As we noted earlier, Masterclean was awarded $26,119.22 in quantum meruit. It contends that it was entitled to an additional $22,149.59 for the value of its removal of asbestos from the two VA buildings. The Law Division determined that Masterclean had not submitted original disposal certificates to Saxon, as required by the contract. The evidence was conflicting on that issue. Our review of the trial record convinces us that Judge Arnold's findings were supported by substantial, credible evidence present in the record. Rova Farms Resort, Inc. v. Investors Ins. Co. of America, 65 N.J. 474, 484, 323 A.2d 495 (1974); R. 2:11-3(e)(1)(A) and (E).
Affirmed.