**RIVER ROAD ASSOCIATES, Plaintiff,**

v.

**CHESAPEAKE DISPLAY AND PACKAGING COMPANY, INC., Defendant.**

Civil Action No. 98–3594(SSB).

United States District Court, D. New Jersey.

June 13, 2000.

David L. Braverman, Janice L. Richter, Fellheimer Braveman & Kaskey, Philadelphia, PA, for Plaintiff.

Glenn P. Callahan, Anthony J. DiMarino, III, McCarter & English, LLP, Cherry Hill, NJ, for Defendant.

## OPINION ON PLAINTIFF RIVER ROAD ASSOCIATES' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANT CHESAPEAKE DISPLAY AND PACKAGING COMPANY, INC'S CROSSMOTION FOR SUMMARY JUDGMENT

BROTMAN, District Judge.

Presently before this Court, pursuant to 28 U.S.C. § 1446(a) (removal statute) and 28 U.S.C. § 1332 (diversity of citizenship), is Plaintiff River Road Associates Motion for Partial Summary Judgment seeking the enforcement of ¶ 6(c) of its Lease agreement with Chesapeake Display and Packaging Company, Inc., as well as the Defendant's Crossmotion seeking the dismissal of Plaintiff's claim under ¶ 6(c) of the agreement.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On January 21st 1994 Plaintiff River Road Associates ("River Road" or "Landlord" ) agreed to lease a building located in Pennsauken, New Jersey to Defendant Chesapeake Display and Packaging Company, Inc. ("Chesapeake" or "Tenant"). (*See* Pl.'s Br. at 2) The lease provided for a one year rental period with renewal options for three additional years. (*See* Lease at ¶¶ 2, 3(a), attached as Ex. 1 to Pl.'s Br. (hereinafter "Lease")) Exercising its options to renew under the lease, Ches-

apeake occupied the premises from March of 1994 until June of 1997, when the parties attempted to negotiate an amendment that would provide for a five year lease extension. (*See* Pl.'s Br. at 3) However negotiations broke down, and the Defendant vacated the premises in February of 1998, at the close of the final lease period. (*See id.*) The instant dispute arises out of the Defendant's alleged failure to comply with paragraph 6(c) of the Lease, which imposes a duty upon the Tenant to remediate all "material structural defects."

Paragraph 6(c) of the Lease provides, in pertinent part, that:

> Tenant *shall cause an engineering report … to be completed* and a copy thereof delivered to Landlord by not later than 30 days *prior to the termination date of this Lease …*. If, as a result of such report, Landlord and the Engineering Firm reasonably determine that a *material structural defect* exists in the Premises[,] … or the Premises … are otherwise not in material compliance with all Laws and Regulations, Tenant shall, at Tenant's expense, cause such defect to be remedied. *In the event that this Lease terminates prior to the completion of such remediation,* Tenant shall continue such remediation and shall continue to be responsible as though this Lease had continued, and *Landlord shall have the option … to reinstate this Lease … under the same terms and conditions as were in effect immediately prior to termination until such remediation has, in the reasonable opinion of Landlord and the Engineering Firm, been completed.*

(*See* Lease at ¶ 6(c))(emphasis added) [1]

Despite the language of the lease requiring it to do so, Chesapeake elected to vacate the premises without providing River Road with an engineering report. (*See* Pl.'s Br. at 3; Def.'s Br. at 7) As a result, the Plaintiff conducted a survey of its own.

---

1. In addition, subsection b of paragraph six includes a provision in which River Road, as Landlord, agrees to indemnify and hold Ches-

apeake harmless for any violations or material structural defects existing prior to the commencement of the Lease. (*See id.* at ¶ 6(b))

(*See* Pl.'s Br. at 3) River Road's survey concluded, *inter alia,* that the roof, railroad siding and parking lot needed repair. (*See* Ex. 9B, attached to Pl.'s Br.) The report also found various ADA code violations that needed remediation. (*See id.*) Additionally, a subsequent engineering survey revealed damage to two of the building's support columns. (*See* Kluk Consultants Report, attached as Ex. 11 to Pl.'s Br.)

Asserting that these conditions constituted "material structural defects," the Plaintiff notified Chesapeake that it elected to reinstate the lease consistent with paragraph 6(c) of the agreement. (*See* Letter dated April 3rd 1998 from Richard J. Jubanyik, Esq., to Chesapeake Display & Packaging Co., Atty., attached as Ex. 8 to Pl.'s Br. ) Shortly thereafter River Road filed suit in New Jersey Superior Court, asserting claims for breach of contract. The matter was removed to this Court on July 31st 1998.

On December 17th 1998 the parties entered into a settlement agreement whereby all of Plaintiff's claims were resolved with the exception of River Road's claim for rent due under Paragraph 6(c) of the lease. The premises were subsequently sold "as is" by the Plaintiff in February of 1999 for $ 2,450,000. (*See* Supplemental Affidavit of Jack Adler at ¶ 11)

Plaintiff thereafter filed the instant motion, asserting that it is entitled to recovery for past due rent pursuant to the terms of ¶ 6(c) of the Lease. The Defendant has cross-moved, claiming that ¶ 6(c) represents an unenforceable penalty provision.

## II. SUMMARY JUDGMENT STANDARD

The standard for granting summary judgment is a stringent but surmountable one. That is, summary judgment is appropriate only when the materials of record "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."

Fed.R.Civ.P. 56(c); *Serbin v. Bora Corp.,* 96 F.3d 66, 69 n. 2 (3d Cir.1996). In deciding whether there is a disputed issue of material fact, the court must grant all reasonable inferences from the evidence in favor of the non-moving party. *Serbin,* 96 F.3d at 69 n. 2. The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Supreme Court decisions mandate that a motion for summary judgment must be granted unless the party opposing the motion "provides evidence 'such that a reasonable jury could return a verdict for the non-moving party.'" *Lawrence v. National Westminster Bank of New Jersey,* 98 F.3d 61, 65 (3d Cir.1996) (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505). Moreover, once the moving party has carried its burden of establishing the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, the non-moving party must "by affidavits or by depositions and admissions on file 'mak[e] a showing sufficient to establish ... [that a genuine issue of material fact exists as to each] ... element essential to that party's case.'" *Equimark Commercial Fin. Co. v. C.I.T. Fin. Servs. Corp.,* 812 F.2d 141, 144 (3d Cir.1987) (declaring that a non-movant may not "rest upon mere allegations, general denials, or ... vague statements"). Thus, if the non-movant's evidence is merely "colorable" or is "not significantly probative," the court may grant summary judgment. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505.

## III. DISCUSSION

In order to determine whether the Plaintiff is entitled to summary judgment,

the Court must first determine whether paragraph 6(c), which grants the Landlord the option to reinstate the lease, is enforceable as a matter of law. Defendant Chesapeake argues that New Jersey caselaw addressing stipulated damage clauses establishes that paragraph 6(c) represents an unenforceable penalty provision. The Plaintiff offers two arguments in response. First Plaintiff claims that 6(c) is not a stipulated damage clause, and thus is not subject to the tests for enforceability established by New Jersey caselaw. Alternatively River Road contends that even if the Court finds that 6(c) represents a stipulated damages clause, it is nonetheless enforceable because it satisfies New Jersey's criterion for enforceability.

A) *Nature of Paragraph 6(c)*

Initially Plaintiff contends that the enforceability of paragraph 6(c) is not governed by the caselaw relied upon by Defendant. Noting that the paragraph makes no reference to the phrase "liquidated damages," River Road argues that the provision "merely gives the Landlord the option to reinstate the lease .... until Chesapeake completed remediation of material structural defects and brought the property in compliance with all Laws and Regulations[.]" (*See* Pl.'s Reply Br. at 2) Thus Plaintiff contends that the stipulated damage caselaw cited by Defendant is inapplicable, and the clause should be enforced like any other contract provision. The Court disagrees.

Although Plaintiff stresses the fact that the term "liquidated damages" is not used in the paragraph,[2] New Jersey caselaw counsels against reliance upon strict adherence to formalistic requirements in examining such clauses. *Cf. Wasserman's Inc. v. Township of Middletown*, 137 N.J. 238, 645 A.2d 100, 107 (1994)(explaining that New Jersey courts assessing the enforceability of stipulated damages clauses have "relied on the 'circumstances of the case and not on the words used by the parties' ")(quoting *Gibbs v. Cooper*, 86 N.J.L. 226, 90 A. 1115, 1116 (1914)); *Spialter v. Testa*, 162 N.J.Super. 421, 392 A.2d 1265, 1268 (1978)(reasoning that although the "clause at issue does not specifically use the term liquidated damages[, t]hat alone is not determinative, for the court must look to substance as well as form"). As a result, in order to determine whether 6(c) constitutes a stipulated damages clause, and is thereby subject to the caselaw cited by the Defendant, the Court will focus its inquiry upon the overall substance of paragraph 6.

■ Under New Jersey law, a provision that provides for the payment of specified damages in the event of breach is classified as a stipulated damage clause. *See Metlife v. Washington Ave. Assoc.*, 159 N.J. 484, 732 A.2d 493, 498 (1999). A review of paragraph 6, entitled "Repairs Maintenance," reveals that it is intended to

2. River Road also argues that paragraph 6(c) does not "contain[ ] any provisions relating to remedies in case of breach." (Pl.'s Reply Br. at 3) In support of its argument Plaintiff relies upon paragraph 19 of the Lease, which establishes various remedies available in the event of default. Arguing that paragraph 19 provided "ample explicit provisions relating to ... breach," River Road contends that "it is clear that ¶ 6(c) was not intended to be, nor is a liquidated damage clause[.]" (*Id.*) The Court, however, finds Plaintiff's reliance on paragraph 19 misplaced. Sub-paragraph 19(b)(vii) expressly provides that *"no right or remedy herein conferred ... is intended to be exclusive* of any other right or remedy herein or by law provided, *but each shall be cumula-*

tive and in addition to every other right or remedy[.]" (Lease at ¶ 19(b)(vii))(emphasis added) This language clearly states that Paragraph 19 was not intended to provide an exclusive list of remedies, thereby negating any reliance on the provision as evidence that paragraph 6(c) was not intended to serve as a stipulated damage provision. Moreover, the Court notes that Plaintiff's initial moving brief, which refers to the clause as a "Damage Clause," expressly states that the clause "permits River Road to continue to receive monthly rental payments from Chesapeake *upon Chesapeake's failure to adhere to the requirements of the lease."* (*See* Pl.'s Br. at 14)(emphasis added)

provide a detailed list of the various maintenance obligations and rights that the Landlord and Tenant are entitled to under the Lease. (*See generally* Lease at ¶ 6) In subsection b of the paragraph the Tenant "certifies that *on the date on which this Lease terminates,* to the best of Tenant's knowledge, (i) the Premises will be in material compliance with all then current Laws and regulations and (ii) there will exist no material structural defect in the premises." (Lease at ¶ 6(b))(emphasis added)

Subsection c imposes additional duties upon the Tenant. First it instructs the Tenant to provide the Landlord with a copy of an engineering report 30 days prior to the termination of the lease. (*See* Lease at ¶ 6(c)) If, based on this report, the Landlord and engineering firm determine that a material structural defect exists or that the premises are no longer in material compliance with all laws and regulations, paragraph 6(c) provides that the "Tenant shall, at Tenant's expense, cause such defect to be remedied." (*Id.* At ¶ 6(c))

■ Viewing 6(c) in conjunction with the language of sub-paragraph 6(b), which requires the Tenant to certify that it will *leave the premises* free from any material structural defects or material noncompliance with applicable regulations, it is clear that the parties intended to impose a contractual duty upon the Tenant to *deliver the premises* free from any material defects or violations.[3] It necessarily follows that the sentence granting the Landlord the "option" to reinstate the Lease in the event that it expired "prior to the completion of such remediation"[4] was intended to serve as a method by which the parties could set a fixed amount of damages (the amount of rent that would have been due

under the lease) if Tenant breached this provision by failing to deliver a premises free from material defects. Because the net effect of 6(c) is to specify an amount of damages in the event of a specific type of breach, the clause constitutes a stipulated damage clause and is subject to New Jersey's law regarding these provisions.

### B) *Enforceability of Stipulated Damages Clause*

■ Under New Jersey law, the enforceability of a stipulated damage clause hinges upon the court's assessment of whether the provision represents a valid liquidated damage clause or an unenforceable penalty provision. *See Wasserman's Inc. v. Township of Middletown,* 137 N.J. 238, 645 A.2d 100, 110 (1994)(explaining that "[t]he decision whether a stipulated damages clause is enforceable is a question of law for the court"); *see also Metlife Capital Financial Corp. v. Washington Ave. Assoc. L.P.,* 159 N.J. 484, 732 A.2d 493, 498 (1999)( "Enforceable stipulated damage clauses are referred to as 'liquidated damages,' while unenforceable provisions are labeled 'penalties.' "). In the context of commercial contracts, the New Jersey Supreme Court has stated that stipulated damage clauses are presumptively valid. *See id.* at 499. "Thus the party challenging a stipulated damage clause 'must establish that its application amounts to a penalty.' " *Wasserman's, Inc.,* 645 A.2d at 108 (quoting *Haromy v. Sawyer,* 98 Nev. 544, 654 P.2d 1022, 1023 (1982)).

■ In *Wasserman's, Inc.,* the New Jersey Supreme Court adopted a 'reasonableness' approach to assessing the validity of stipulated damage provisions. *See Wasserman's, Inc.,* 645 A.2d at 106. The *Wasserman's, Inc.* court explained that the

---

**3.** This conclusion is supported by the Affidavit of Jack Adler, the managing partner of River Road. In the affidavit Adler asserts that "I was successful in negotiating clauses which required that at the time Chesapeake … vacated the property, it would be free of any

material structural defects, [and] in compliance with all laws and regulations[.]" (*See* Aff. of Jack Adler, attached as Ex. 19 to Pl.'s Br.)

**4.** ( Lease at ¶ 6(c))

reasonableness determination hinges upon "whether the set amount 'is a reasonable forecast of just compensation for the harm that is caused by the breach' and whether the harm 'is incapable or very difficult of accurate estimate.'" *Id.* at 107(quoting *Westmount Country Club v. Kameny,* 82 N.J.Super. 200, 197 A.2d 379, 382 (1964)) The court further cautioned that "[u]ncertainty or difficulty in assessing damages is best viewed not as an independent test, but rather as an element of assessing the reasonableness of a liquidated damages clause, ... '[t]he greater the difficulty of estimating or proving damages, the more likely the stipulated damages will appear reasonable.'" *Id.* (quoting *Wassenaar v. Panos,* 111 Wis.2d 518, 331 N.W.2d 357, 362 (1983)).

 Applying these factors to the instant clause, the Court determines that it represents an unenforceable penalty provision. As an initial matter, the Court finds that the type of damages the reinstatement "option" seeks to recover (i.e. lost profits for rent) [5] are not incapable of accurate estimate. Under New Jersey law, a landlord may recover the rental value [6] of a premises for the months in which the building remains vacant while the landlord makes reasonable efforts to mitigate damages. *Cf. Borough of Fort Lee v. Banque Nat'l de Paris and DBR,* 311 N.J.Super. 280, 710 A.2d 1, 7 (1998) Given the fact that the agreement already contained provisions establishing the appropriate month-

ly rental payments, this amount could easily be determined by a trier of fact if it were to conclude that River Road suffered such damages as a result of a breach.[7] Thus the Court finds that it would not be difficult to estimate the type of damages that the stipulated damages provision intended to address. While the finding that damages are not difficult to accurately estimate is not dispositive of unreasonableness, it necessitates a more narrow view of what represents a reasonable forecast. *See Wasserman's, Inc.,* 645 A.2d at 107 (explaining that the more speculative the nature of the damages, the greater the likelihood that the amount will appear reasonable).

Viewing the language of Paragraph 6(c) in light of this conclusion, it is clear that the provision is unreasonable. Paragraph 6(c) provides, in relevant part, that:

> In the event that this Lease terminates prior to the completion of such remediation, *Tenant shall continue such remediation* and shall continue to be responsible as though this Lease had continued, and Landlord *shall have the option, ... to reinstate this Lease ...* under the same terms and conditions as were in effect immediately prior to termination *until such remediation has,* in the reasonable opinion of Landlord and the Engineering Firm, *been completed.*

(Lease at ¶ 6(c))(emphasis added).

An examination of the language of this paragraph reveals that, in addition to re-

5. The Defendant's brief focuses its damage analysis on the costs of remediation. (*See* Def.'s Br. at 12–16) The Court, however, finds that the portion of the agreement allowing the landlord to reinstate the lease seeks to recover for any lost opportunity costs resulting from a vacancy of the premises during the period between termination of the lease and the completion of remediation, not for the costs of the remediation.

6. The fact that the premises were ultimately sold instead of re-rented does not change the focus of the Court's inquiry. As discussed above, the parties settled their dispute regarding the cost of repairs required to alleviate any material structural defects or material

violations existing at the termination of the lease. (*See* Section I, *supra,* at p. 3) This agreement would presumably address any discrepancy that existed between the fair market value of the premises at the time the premises were initially leased to Chesapeake and at the time the lease was terminated.

7. The Court recognizes that both parties have submitted evidence regarding River Road's duty to mitigate. Because the reasonability of a landlord's mitigation efforts remains a question for the trier of fact, *see Borough of Fort Lee v. Banque Nat'l de Paris and DBR,* 311 N.J.Super. 280, 710 A.2d 1, 7 (1998), the Court refuses to decide this issue at this time.

quiring the Tenant to pay for the costs of remediation, 6(c) allows the Landlord to collect monthly rent from the vacated Tenant until the Tenant remediates the defect. Such a provision is inconsistent with New Jersey law, which imposes upon commercial landlords a duty to mitigate damages. *See McGuire v. City of Jersey City*, 125 N.J. 310, 593 A.2d 309 (1991). In *Borough of Fort Lee v. Banque National de Paris and DBR*, New Jersey's appellate division reasoned that this duty could include an obligation to make the building repairs necessary to actively market a premises. 311 N.J.Super. 280, 710 A.2d 1, 7 (1998). The language of 6(c) relieves River Road of this duty by allowing the landlord to sit idly by and recover monthly rental payments without making any effort to relet or repair the premises. This failure to address the landlord's duty to mitigate renders the provision an unreasonable forecast of the harm anticipated in the event of a breach.[8] Further, enforcing such a provision would violate the public policy of New Jersey by encouraging economic waste, the very concern that motivated the appellate division to extend the duty to mitigate to the commercial lease

context. *See Fanarjian v. Moskowitz*, 237 N.J.Super. 395, 568 A.2d 94, 98–99 (1989);[9] *cf. Saxon Constr. & Management Corp. v. Masterclean of North Carolina, Inc.*, 273 N.J.Super. 231, 641 A.2d 1056, 1059 (1994)(upholding a trial court's refusal to enforce a termination clause in a contract because, among other things, it encouraged waste by "discourag[ing] the [nonbreaching party] from affirmatively seeking to minimize damages").

Additionally the Court finds the provision unenforceable because it has an *in terrorem* effect. *In terrorem* clauses are those that seek not just to compensate the injured party for its loss, but to deter breach by compelling performance. Such a clause frustrates the underlying principles of contract law by effectively removing from the parties the option to breach and pay damages.

> Enforcement of [in terrorem] provision[s] would allow the parties to depart from the fundamental principle that the law's goal on breach of contract is not to deter breach by compelling the promisor to perform, but rather to redress breach by compensating the promissee. It is this departure that is proscribed when a

**8.** The Court recognizes that New Jersey has adopted the modern approach to assessing stipulated damage clauses, which instructs a court to also consider reasonableness at the time of breach. *See Wasserman's Inc.*, 645 A.2d at 107; *see also* N.J.S.A. 12A:2–718(adopting the Uniform Commercial Code provision, which provides that a damage clause may be "reasonable in light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or non-feasibility of otherwise obtaining an adequate remedy"). Arguing that the vacancy of the premises for approximately one year has resulted in over $300,000 in damages, (*see generally* Supplemental Affidavit of Jack Adler), the Plaintiff contends that the damages provided for under paragraph 6(c) (which appear to be roughly $280,000) represent a reasonable forecast of actual damages. However, the Plaintiff's argument is flawed because its assessment of damages fails to adequately consider that some of the damages the Plaintiff alleges may not have resulted from Chesapeake's breach, but rather from River Road's failure to miti-

gate damages. As a result Plaintiff's alleged damages represent an inaccurate yardstick by which to compare the reasonableness of 6(c). Because the Court finds the basis upon which Plaintiff calculated its damages inherently flawed, it accords little significance upon this factor as a means for assessing the reasonableness of the provision and thus rejects the contention that 6(c) is reasonable in light of the damages sustained.

**9.** The *Fanarjian* court left open the issue of whether parties to a commercial lease could expressly contract away the duty to mitigate. *See Fanarjian*, 568 A.2d at 100. However the Court finds that even if the New Jersey Supreme Court allowed parties to do so, the instant clause, which fails to expressly mention the duty to mitigate, could not reasonably be considered an express disclaimer of this duty. *Cf. Carisi v. Wax*, 192 N.J.Super. 536, 471 A.2d 439, 442–43 (1983)(concluding that a clause in a commercial lease which provided that a landlord was entitled to recover rent from a vacating tenant did not operate as a sufficient disclaimer of the duty to mitigate).

court characterizes such a provision as a penalty.

E. Allan Farnsworth, Contracts § 12.18, at 841 (3d ed.1999). In *Wasserman's Inc.*, the Supreme Court noted that provisions which seek to secure performance, as opposed to merely provide just compensation for non-performance, are unenforceable. 645 A.2d at 108–09 (explaining that "[t]he purpose of a stipulated damages clause is not to compel the promisor to perform, but to compensate the promisee for non-performance .... [a] clause is unreasonable if it does more than compensate plaintiffs for their approximate actual damages caused by the breach").

Here, ¶ 6(c) provides that the Landlord may reinstate the Lease *until the Tenant remediates any material defects.* This language not only forces Chesapeake to perform, but also conditions the amount of damages upon the Defendant's ultimate performance of the agreement. Thus the only method by which Chesapeake could prevent damages from skyrocketing to astronomical amounts would be by remediating any material defects post-haste. Because ¶ 6(c) does not attempt to provide a reasonable forecast of just compensation, but rather seeks to compel the Tenant to perform, it has an *in terrorem* effect that renders that portion of the agreement which granted River Road the option to reinstate the Lease unenforceable. As a result the Plaintiff's motion for summary judgment is denied.

■ However River Road is not precluded from recovering for lost rent merely because the Court finds the "option" portion of ¶ 6(c) unenforceable. "[O]nce the trial court has determined that a liquidated damage clause constitutes a penalty ... the party that attempted to impose that penalty is remitted to the ordinary recourse of proving actual damages sustained." *Metlife Capital Fin. Corp. v. Washington Avenue Assocs.*, 313 N.J.Super. 525, 713 A.2d 527, 537 (1998), *rev'd in part on other grounds*, 159 N.J. 484, 732 A.2d 493 (1999); *see also* Farnsworth, *supra*, § 12.18 at 843 (explaining that when part of an agreement is "condemned as a penalty, it is unenforceable. But the rest of the agreement stands, and the injured party is remitted to the conventional damage remedy for breach of the agreement").

Under New Jersey law, a commercial landlord may recover for lost rental income resulting from a tenant's breach of a lease. *See McGuire*, 593 A.2d at 315. However the recovery is subject to the duty to mitigate. *Id.* at 315–16. Because New Jersey caselaw entitles a landlord to recover such damages, the Court can not conclude as a matter of law that the unenforceability of the "option" language of 6(c) precludes River Road from recovering for lost rent resulting from Chesapeake's alleged failure to leave the premises free of material defects. Since questions of fact remain as to Chesapeake's alleged breach of this duty,[10] as well as to the reasonable-

---

**10.** Although both parties argue that no questions of fact exist regarding the issue of whether any "material structural defect" existed, the Court disagrees. In ¶ 6(b) of the agreement the Landlord certified that at the time the Lease was commenced the premises were free of "Existing Defects" (i.e. material structural defects existing prior to commencement of the Lease) and were in material compliance with all laws and regulations. (*See* Lease at ¶ 6(b)) Paragraph 6(b) also included a clause in which the Landlord agreed to "indemnify Tenant and *hold harmless from and against any actions,* causes of action, suits ... *incurred by Tenant as a result of* any noncompliance ... *with any Laws and Regulations if such noncompliance existed prior to*

the Commencement Date ('Existing Violations') or *any Existing Defect." (Id.)*(emphasis added) Thus if the alleged defects complained of existed prior to the commencement of the Lease, Chesapeake would not be responsible for them under the provisions of 6(b).

Here there is evidence supporting a reasonable inference that many of the defects alleged may have existed prior to the commencement of the Lease. In a letter-report sent from Gary W. Ruel, President of Ruel Construction, Inc., to counsel for the Defendant, it was asserted that the condition of the roof and parking lot was either approximately the same as it was prior to the commence-

ness of River Road's mitigation efforts,[11] the Defendant's motion for summary judgment seeking the dismissal of Plaintiff's claims is likewise denied. At trial the fact-finder will have to determine: 1) whether Chesapeake breached ¶ 6(c) by failing to deliver the premises in a condition free of "material structural defects"; and if so, 2) what, if any, amount of "lost rent" River Road is entitled to given its duty to mitigate damages.

## IV. CONCLUSION

For the reasons stated above, the Plaintiff's motion for summary judgment is denied and the Defendant's crossmotion for summary judgment is denied.

The Court will enter an appropriate order.

## ORDER ON PLAINTIFF RIVER ROAD ASSOCIATES' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANT CHESAPEAKE DISPLAY AND PACKAGING COMPANY, INC'S CROSSMOTION FOR SUMMARY JUDGMENT

THIS MATTER having come before the Court on Plaintiff River Road Associates' motion for partial summary judgment and

Defendant Chesapeake display and Packaging Company, Inc.'s crossmotion for summary judgment;

The Court Having Considered the Parties submissions; and

For the reasons set forth in the Court's opinion of this date;

IT IS on this day 13th day of June, 2000 HEREBY

ORDERED that the Plaintiff's motion for partial summary judgment is DENIED

AND IT IS FURTHER ORDERED that the Defendant's cross-motion for summary judgment is also DENIED.

No Costs.

ment of the Lease, or was the result of improper maintenance prior to Chesapeake's tenancy. (*See* Nov. 5th 1998 letter-report from Gary W. Ruel, President of Ruel Construction, Inc., to Anthony J. DiMarino, III, counsel for Defendant Chesapeake, attached as Ex. 7 to Pl.'s Br.) A review of Plaintiff's brief reveals that the ADA violations complained of arguably existed prior to the leasing of the premises. (*See* Pl.'s Br. at 11)(explaining that the regulations at issue went into effect in 1992, two years prior to the commencement of the lease). It is also unclear whether the alleged railroad violations existed prior to Chesapeake's occupancy. The report relied on by the Plaintiff to establish noncompliance with the Federal Railway Administration's Class I standards fails to state whether the rails were in compliance prior to the Lease's commencement, and further states that "the reason for the above conditions is a lack of maintenance on the siding *for some time.*" (*See* letter-report from

James J. Daloisio, of Railroad Construction Co. of South Jersey, Inc., to Jack Adler, Managing Partner of River Road, attached as Ex. 10 to Pl.'s Br.)

Additionally reasonable minds could differ as to the "material" nature of these alleged defects and violations. Similarly the Court can not conclude as a matter of law that the damage to the load bearing walls, which was characterized as severe by Plaintiff's expert, rises to the level of a "material structural defect," a term which is undefined in the agreement and is not incorporated in Plaintiff's expert report. (*See* Kluk Consultants Report, attached as Ex. 11 of Pl.'s Br.)

11. The trier of fact will have to determine both the nature (e.g., was River Road required to repair the premises itself) and extent of the duty to mitigate, as well as its effect on Chesapeake's alleged inability to relet the premises.